**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MGM WELL SERVICES, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1634 |
| | § | |
| MEGA LIFT SYSTEMS, LLC, | § | |
| Defendant. | § | |

## MEMORANDUM ON CLAIM CONSTRUCTION

This patent infringement case is before the Court for construction of the disputed claim terms in United States Patent No. 6,719,060 ("the '060 Patent") owned by Plaintiff MGM Well Services, Inc. ("MGM"). The Court conducted a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996) ("*Markman* hearing") on February 1, 2006. Based on the evidence before the Court, primarily the language of the claims and the patent specifications, the arguments presented by counsel at the *Markman* hearing, and the governing legal authorities, the Court issues this Memorandum construing the disputed claim terms.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

MGM is the owner of the '060 Patent" which was issued on April 13, 2004. Generally, the '060 Patent relates to what is referred to as a "two-piece plunger lift" system for use in gas wells to remove accumulated liquids and thereby increase the gas

flow through the well to the surface.  This short-hand is, however, something of a misnomer because the patented devices consist of more than two pieces.  There is at least a sleeve and a lower component, usually ball-shaped (i.e., spherical) or a "dart," which, when together, form a piston or plunger-type unit.  There is also a separator rod, a housing, and some mechanism for interrupting the gas flow in order to release the sleeve so it falls back into the well.

The '060 Patent covers a "catcher assembly" located in a housing connected to the well at the surface that generally utilizes the unique shape of the separator rod and/or the sleeve, as well as the pressure from the flow of well contents, usually gas, to hold the plunger sleeve at the surface against gravity as desired.  To release the plunger sleeve so it will fall back down the well, the flow of well contents around and through the sleeve is interrupted.  In a primary embodiment, a motorized valve near the surface is closed for several seconds blocking the gas from the well from reaching the plunger.

MGM alleges that Defendant Mega Lift Systems, LLC ("Mega Lift"), one of MGM's prior distributors, is marketing an infringing product called the "Chaser" system.  Mega Lift argues that the '060 Patent is invalid as either anticipated by or made obvious by undisclosed prior art.

The parties filed briefs identifying the disputed claim terms and addressing their respective proposed construction.  *See* Plaintiff's Opening Brief [Doc. # 66]; Defendant's Brief [Doc. # 67]; Plaintiff's Reply Brief [Doc. # 69].  They also filed a Claim Construction Chart [Doc. # 73], which proved very helpful during the *Markman* hearing.  Subsequently, the parties provided the Court with copies of the demonstrative exhibits used during the hearing.  The claim construction issues are now ripe for decision.

## II.   GENERAL LEGAL STANDARDS FOR CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004), *pet. for cert. filed* Nov. 9, 2005.  The patent claims in issue must be construed as a matter of law to determine their scope and meaning.  *See, e.g., Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir.) (*en banc*).

The words of a claim "are generally given their ordinary and customary meaning."  *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The "ordinary and customary meaning of a

claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313.  This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

For other claim terms, however, the meaning of the claim language may be less apparent.  To construe those terms, the Court considers "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (citing *Innova*, 381 F.3d at 1116).  The Court may also consider dictionaries, both technical and general purpose.  *See id.*

The claims "provide substantial guidance as to the meaning of particular claim terms." *Id.* The Court may consider the context in which the terms are used and the differences among the claims. *See id.* "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Because the claims "are part of a fully integrated written instrument," the Court may also consider the specification and the patent's prosecution history. *Id.* at 1315, 1317.

The Court may also consider "extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* at 1317 (quoting *Markman*, 52 F.3d at 980). Yet although extrinsic evidence may assist the Court in claim construction, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotations and citation omitted). As a result, extrinsic evidence should be "considered in the context of the intrinsic evidence." *Id.* at 1319.

The Federal Circuit has emphasized that "there is no magic formula or catechism for conducting claim construction.  Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.  "The sequence of steps used by the judge in

consulting various sources is not important; what matters is for the court to attach the

appropriate weight to be assigned to those sources in light of the statutes and policies

that inform patent law." *Id.* (citing *Vitronics*, 90 F.3d at 1582).

## III.   CONSTRUCTION OF DISPUTED CLAIM TERMS

First, the Court notes that there are several claim terms which the parties agree

do not require construction.[1]  The parties agree on the proper construction of several

other claim terms.[2]  Consequently, as to these claim terms, there is no controversy and

the Court adopts the parties' agreed construction.

Several of the disputed claim terms appear in more than one claim.  Rather that

construe the disputed terms claim by claim, which would result in significant repetition,

---

[1]     For example, the parties agree that the phrase "providing a seating surface for receiving the lower component so the lower component and sleeve join together in the well for pushing liquid, above the piston, upwardly" in Claim 1 and the phrase "closing a valve leading from the well" in Claim 24 are clear and do not require construction.

[2]     These claim terms are "free piston," "lower component," "flow passages comprise a flow passage of variable cross-sectional size between the rod and the sleeve," "the catcher assembly is free of components projecting through the housing into a path of downward movement of the piston sleeve," "production string," "the housing providing a path of falling movement for the sleeve to fall into the production string," "the catcher assembly being free of components extending into the path of falling movement for retaining the sleeve in the housing," "at least one of the flow passages having a first section and a second section, more restricted than the first section."  Additionally, the parties agreed during the *Markman* hearing that the term "a sleeve" should be construed to mean "the generally cylindrical part of a multipart piston having an internal flow passage."  This construction is consistent with the intrinsic evidence as well as the extrinsic evidence, including the Declaration of James L. Bartley, Exh. D to Defendant's Brief [Doc. # 67], ¶ 5 (defining a sleeve as "a cylindrical structure . . . which has an interior flow passage . . ..").

the Court will construe each term and that construction will apply to the claim term each time it appears in a claim in the '060 Patent.

The Court has carefully reviewed the patent and other evidence of record, has considered counsel's arguments presented at the *Markman* hearing, and has applied the governing legal principles from the Federal Circuit.  On this basis, the Court construes the following terms from the '060 Patent.

A.    **"A Catcher Assembly on the Well at the Surface"**

The parties disagree about the proper construction of each element of this phrase, which first appears in Claim 1.  Plaintiff suggests that the "catcher assembly" includes both the housing and the separator rod.  Defendant disagrees.  The Court construes this element of the claim phrase to include both the housing and the separator rod.  The term refers to an "assembly" which indicates more than one component, and the "catcher assembly" is "comprising" a housing, a separator rod . . .."  Although the claim language would be more clear if the word "and" were inserted between "a housing" and "a separator rod," the Court concludes that the language in Claim 1 establishes that the "catcher assembly" includes the housing and the separator rod.

The parties also disagree on the proper construction of "on the well."  The Court construes this element to mean that the catcher assembly is above the well and is connected, either directly or indirectly, to the well.   Contrary to Defendant's

suggestion, there is no requirement that the catcher assembly be "supported by" or "in contact with" the well, although support or contact, whether direct or indirect, is not precluded by the claim term.

The parties disagree on the proper construction of the term "at the surface." The Court construes this language to require that some part of the catcher assembly be at the same level as or a short distance above the surface. The entire assembly cannot be below the surface.

The Court construes the claim phrase "a catcher assembly on the well at the surface" to mean "an assembly that includes the housing and the separator rod that is located on top of or slightly above the well, where some portion of the assembly is at or a short distance above the surface."

**B.     "A Housing"**

Mega Lift suggests that the term "a housing," first appearing in Claim 1, is clear and does not require construction, but does not oppose construing the term to mean "a case or enclosure attached to the top of the well bore." The Court finds this construction to be consistent with the intrinsic evidence.

C.    "**A Separator Rod in the Housing for Receiving the Sleeve Thereon and Dislodging the Lower Component**"

Defendant argues that this claim term, that first appears in Claim 1, should be construed in accordance with 35 U.S.C. § 112, ¶ 6, as a means plus function limitation. Section 112, ¶ 6, provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.  Where, as here, the claim term does not use the word "means," there is "a rebuttable presumption that section 112, paragraph 6, does not apply."  *See Phillips*, 415 F.3d at 1311; *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).  The "presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."  *Lighting World*, 382 F.3d at 1358.  The presumption can be rebutted "if it is demonstrated that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function."  *Id.* (internal quotations and citations omitted).

In this case the function to be performed is "receiving the sleeve thereon and dislodging the lower component."  The claim recites sufficient structure for performing that function – the separator rod.   Therefore, Defendant has not rebutted the

presumption that the claim term is not construed pursuant to section 112, paragraph 6. Instead, the Court construes this claim term to mean "a rod located within the housing, which rod extends through the internal flow passage of the sleeve and is capable of separating the lower component from the sleeve when the sleeve moves upwardly into the housing."

### D.   **"The Housing, Rod and Sleeve Providing Therebetween Flow Passages for Formation Contents"**

The parties' disagreement about the proper construction of this claim phrase, first appearing in Claim 1, is minor. Indeed, their proposed constructions are very similar, with Defendant's proposal being more specific and clear. The Court construes this claim term to mean "The housing, separator rod and sleeve provide for two or more flow passages for formation contents (fluid) where the formation contents flow (1) between the separator rod and sleeve and (2) between the sleeve and the housing."

### E.   **"At Least One of the Flow Passages Being of Variable Cross-Sectional Size Producing a Pressure Drop Sufficient to Hold the Sleeve in the Housing Against Gravity"**

The parties disagree about the proper construction of this language, which first appears in Claim 1. Defendant proposes that "hold" should include time and flow rate limitations, specifically "for some period of time and for some flow rate." The Court concludes that if this proposed language has any substantive meaning, any such

limitations are not consistent with the intrinsic evidence.  The Court construes this claim term to mean "at least one of the flow passageways being of variable cross-sectional size such that the well contents flow creates a pressure beneath the sleeve that is higher than the pressure above the sleeve, the difference in pressure being sufficient to maintain the sleeve in the housing and to prevent gravity from causing the sleeve to fall back into the well."

### F.     "A Bulging Section"

Defendant argues that the term "bulging section," which first appears in Claim 3, a claim dependent on Claims 1 and 2, should be construed under section 112, paragraph 6, as a means plus function limitation.  As was discussed in Section (C) above, the claim language does not use the term "means" and, therefore, there is a rebuttable presumption that section 112, paragraph 6 does not apply.  *See Phillips*, 415 F.3d at 1311; *Lighting World*, 382 F.3d at 1358.  In this claim term, the function is to provide flow passages of variable cross-sectional size.  The claim identifies a sufficient structure to perform this function, specifically the bulging section of the separator rod. Consequently, this claim term is construed to mean "an expanded or enlarged section of the separator rod that tapers back to the main section of the separator rod."

### G.     "Producing a Pressure Drop Sufficient to Hold the Sleeve in the Housing Against Gravity"

11

This language, which appears in Claim 8, an independent claim, is also contained in the claim term discussed in Section (E) above.  Defendant proposes vague time and flow rate limitations that do not have substantive meaning.  To the extent Defendant asserts these words somehow limit the device claimed in Claim 8, the limitations are not supported by the intrinsic evidence.  As a result, the Court construes this claim term to mean "flow creates a pressure beneath the sleeve that is higher than the pressure above the sleeve, the difference in pressure being sufficient to maintain the sleeve in the housing and to prevent gravity from causing the sleeve to fall back into the well."

## H.     "An Outlet"

Plaintiff contends that the term "an outlet," first appearing in Claim 9, is clear and does not require construction by the Court.  Defendant proposes a construction that requires the outlet to be positioned "at some distance from the end of the housing where the inlet is located."  The phrase in Claim 9 that includes the term "outlet" specifies that the inlet is at an end of the housing and that the outlet is spaced from the end.  Consequently, it is clear from the language that the outlet is not in the same position as the inlet, and the term "outlet" does not require further construction.

## I.     "The Sleeve Moves Downwardly From the First Section to the Second Section and Decreases a Flow Passage Thereby Maintaining a Pressure Drop Across the Sleeve Sufficient to Hold the Sleeve Against Gravity"

The parties' dispute in connection with this claim term, which appears in Claim 15, relates primarily to whether the flow passages between the separator rod and the sleeve and between the sleeve and the housing, described earlier in the claim, are potential flow passages for this element of the claim. Defendant argues that because the claim uses the term "a flow passage" rather than "the flow passage," any previously identified flow passage is excluded. Defendant's argument is contrary to the intrinsic evidence in the case. A little earlier in Claim 15, the claim includes the limitation "the separator rod, the housing and the sleeve providing flow passages to the outlet" and refers to "at least one of the flow passages." Consequently, it makes no sense and would be confusing to refer to "the" flow passage where, as here, more than one flow passage has been described.

Additionally, Defendant's argument is not supported by *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003), the case on which Mega Lift relies. In *Warner-Lambert*, the owner of a drug patent sued a competitor alleging infringement. The Federal Circuit noted that applications for drugs seek approval for certain uses of those drugs and, therefore, the term "the use" in a statute refers to the specific use for which approval had been granted. *Id.* at 1356. The Federal Circuit did not hold in *Warner-Lambert* that use of the word "a" precludes reference to any similar term in the patent preceded by the word "the." Instead, *Warner-Lambert* stated simply

13

that the words "the use" in a statute refer "to a specific 'use' rather than a previously undefined 'use.'"  *Id*.

Based on a review of the intrinsic evidence and the cited legal authorities, the Court construes this claim language to mean "as the sleeve moves downward from the first section to the second section, *a flow passage* becomes more restricted thereby maintaining a pressure drop across the sleeve sufficient to maintain the sleeve in the housing and to prevent gravity from causing the sleeve to fall back into the well."  The flow passage italicized in the Court's construction can be the flow passage between the separator rod and the sleeve, the flow passage between the sleeve and the housing, or some other flow passage in the housing.[3]

---

[3]     Furthermore, for the same reasons described in Sections (E) and (G) above, the Court again rejects Mega Lift's proposed addition of the language "for some period of time and for some flow rate."

**J.     "<u>Decoupler on the Well Head</u>"**

Plaintiff argues that the "decoupler" in independent Claim 22 includes a housing or some other container, casing, or enclosure.  Defendant argues that the "decoupler" is solely the separator rod.  The Court finds Plaintiff's argument to be persuasive in light of the intrinsic evidence.  The claim later provides that the sleeve is held "in" the decoupler.  The sleeve could not be held "in the decoupler" if the decoupler is nothing more than the separator rod.  Additionally, the separator rod is frequently referenced throughout the patent and there would be no need for a new term – "decoupler" – in Claim 22 if it were nothing more than the separator rod.

For these reasons, the Court construes the claim term "decoupler" to mean "a container or housing on the well head containing a separator rod onto which the sleeve of a multipart piston passes to dislodge the lower component of the piston."

**K.     "<u>Holding the Sleeve in the Decoupler By Passing Formation Contents Upwardly</u>"**

The parties' disagreement regarding this claim term, which appears in Claim 22, is related to the disagreement regarding the claim term discussed in Section (J) above. For the same reasons, the Court construes the disputed term "holding the sleeve in the decoupler by passing formation contents upwardly" to mean "holding the sleeve on the rod in the container or casing."

**L.    "Releasing the Sleeve and Allowing It to Fall into the Well by Restricting Flow of Formation Contents"**

Plaintiff asserts that this claim phrase in Claim 22 should be construed consistently with other terms in the patent claims, and thus requires no additional construction by the Court.  The Court agrees.  Defendant argues, based on its prior contentions, that a "decoupler" does not require a container or casing.  The Court earlier rejected Defendant's argument in connection with the terms in Sections (J) and (K).  The Court concludes that the claim phrase "releasing the sleeve and allowing it to fall into the well by restricting flow of formation contents" needs no further construction in light of the claim construction rulings above.

**M.    "The Holding Step Comprises Creating a Pressure Drop Across the Sleeve"**

This claim term first appears in Claim 23, a method claim.  At the *Markman* hearing, the parties agreed that this claim term means "the holding step comprises creating a pressure drop sufficient to maintain the sleeve in the housing and to prevent gravity from causing the sleeve to fall back into the well."  Mega Lift, however, seeks to add at the end of the phrase the following: "without regard to how the pressure drop is created."  The Court finds no basis in the intrinsic or extrinsic evidence for Mega Lift's requested surplusage.

## IV.   **CONCLUSION**

The Court accepts the parties' agreement regarding the construction of the terms described in footnote 2.  Similarly, the Court agrees with the parties' belief that the terms listed in footnote 1 do not require construction by the Court.  The Court has considered the intrinsic evidence and, to the extent necessary, the extrinsic evidence in the record.  Based on the evidence and the application of governing legal principles, the Court construes the disputed claim terms as set forth herein.

As mentioned following the *Markman* hearing, the Court strongly suggests that the parties engage in good faith settlement negotiations and, if unsuccessful, then mediation in good faith.

The remaining deadlines in the Court's Docket Control Order [Doc. # 44] remain in effect.

SIGNED at Houston, Texas, this **10th** day of **February, 2006.**

_____
Nancy F. Atlas
United States District Judge