## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MGM WELL SERVICES, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1634 |
| | § | |
| MEGA LIFT SYSTEMS, LLC, | § | |
|     Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff MGM Well Services, Inc. ("MGM") filed this patent infringement lawsuit against Mega Lift Systems, LLC ("Mega Lift"). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a), and venue in this district is proper under 28 U.S.C. §§ 1391(b)-(c) and 1400(b).

The case was tried to the Court beginning April 2, 2007. Having heard and observed the witnesses who testified at trial, having considered the exhibits introduced by the parties, and having reviewed all matters of record in this case, the Court makes the following findings of fact and conclusions of law.[1]

---

[1] The Court explains the evidence and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law. To the extent a finding of fact is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

## I.  **BACKGROUND**

The United States Patent and Trademark Office ("USPTO") issued United States Patent Number 6,719,060 ("the '060 Patent") on April 13, 2004.  Edward A. Wells is the named inventor on the '060 Patent, which he assigned to MGM in December 2004. Integrated Production Services ("IPS") now owns MGM, and Complete Production Services owns IPS.

As will be discussed in more detail below, the '060 Patent relates to a two-piece plunger lift system[2] for use in gas wells to remove accumulated liquids and thereby increase the gas flow through the well to the surface.  The '060 Patent incorporated by reference two earlier patents for two-piece plunger lift systems owned by MGM – United States Patent Number 6,209,637 ("the '637 Patent") and United States Patent Number 6,467,541 ("the '541 Patent").  The '060 Patent improved on these two-piece plunger lift systems by including a "catcher assembly" located in the housing connected to the well at the surface that utilizes the flow of gas from the well to create a pressure drop that holds the plunger sleeve at the surface against gravity until a motor valve near the surface is closed for a very few seconds to block the gas from the well from

---

[2]      The system is referred to as a "two-piece" system because the actual plunger has two pieces. The patented devices, however, consist of more than two pieces.  The device described in the '060 Patent, for example, can be viewed as consisting of five main components:  the sleeve, the ball, the separator rod, the housing (often referred to as the "lubricator"), and the mechanism for interrupting the gas flow in order to release the sleeve.

reaching the plunger.  The plunger sleeve then falls back to the bottom of the well where it reunites with the ball.

MGM became aware that Mega Lift, one of its prior distributors, was selling a two-piece plunger lift system called the "Chaser" system.  The Court finds from the evidence at trial that Mega Lift's system, which initially included a teardrop shaped rod, was "developed" fundamentally by Mega Lift's principal, James Bartley, copying an MGM system that he obtained.  MGM filed this lawsuit for patent infringement on May 6, 2005, and served the summons and complaint on Mega Lift on May 13, 2005.  MGM filed an Amended Complaint [Doc. # 13] on June 1, 2005.  On July 19, 2005, the Court issued a preliminary injunction [Doc. # 29] enjoining Mega Lift from infringing or contributing to the infringement of the '060 Patent.  In response to the preliminary injunction, Mega Lift began manufacturing and selling a two-piece plunger lift system with a straight separator rod instead of the teardrop shaped rod it was using before the injunction.

The Court conducted a *Markman*[3] hearing on February 1, 2006, and issued its Memorandum on Claim Construction [Doc. # 77] on February 10, 2006.[4]  Following

---

[3]      *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

[4]      The Court amended the Memorandum on Claim Construction on March 22, 2006 [Doc. # 79] and on April 11, 2007 [Doc. # 250].

discovery and briefing of dispositive motions, the Court granted summary judgment in MGM's favor on Mega Lift's defenses regarding invalidity and unenforceability.  The Court also excluded certain evidence proffered by Mega Lift, including its technical "expert," evidence regarding two-piece plunger lift systems attributed to Dan Casey, and evidence of dimensions of Mega Lift's plunger lift systems that differed from those produced during discovery.

The case was tried to the Court without a jury for five days beginning April 2, 2007.  The Court heard the witnesses as they testified, reviewed the exhibits introduced by the parties, and questioned witnesses in order to clarify their testimony.  Based on the Court's consideration of the evidence presented at trial, and the application of the governing legal authorities from the United States Court of Appeals for the Federal Circuit, the Court finds and concludes that both Mega Lift "Chaser" systems – the system with the teardrop shaped rod and the system with the straight rod – infringe the '060 Patent.  MGM is entitled to recover its lost profits and to a permanent injunction. Because the case does not rise to the level of an exceptional case under 35 U.S.C. § 285, the Court denies MGM's request for attorneys' fees.

## II.   PATENT INFRINGEMENT

### A.   Applicable Legal Principles

"[W]hoever without authority makes, uses, offers to sell, or sells any patented

invention, within the United States . . . infringes the patent."  35 U.S.C. § 271(a);

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.* 420 F.3d 1369,

1375 (Fed. Cir. 2005).   An accused infringer may be liable for contributory

infringement under 35 U.S.C. § 271(c)[5] if the patent holder proves that the defendant

made the patented device, that the device has no substantial non-infringing uses, and

that the defendant sold the device within the United States to a customer whose use of

the device constituted an act of direct infringement.  *See DSU Med. Corp. v. JMS Co.,*

*Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006).

"A determination of patent infringement requires a two-step analysis: first, the

meaning of the claim language is construed, then the facts are applied to determine if

---

[5]      Title 35, United States Code, section 271(c) provides:

> Whoever offers to sell or sells within the United States or imports into the
> United States a component of a patented machine, manufacture, combination
> or composition, or a material or apparatus for use in practicing a patented
> process, constituting a material part of the invention, knowing the same to be
> especially made or especially adapted for use in an infringement of such
> patent, and not a staple article or commodity of commerce suitable for
> substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c); *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir.
2006).

the accused device falls within the scope of the claims as interpreted." *MBO Lab., Inc.*

*v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007).   The Court

construed the meaning of the disputed claim terms in its Memorandum on Claim

Construction [Doc. # 77], as amended by the Order [Doc. # 79] entered March 22,

2006, and the Order [Doc. # 250] entered April 11, 2007.   The Court incorporates its

claim construction, including the parties' stipulated construction of certain terms, as if

set forth in its entirety herein.

The second step, "comparison of the claims to the accused device, is a question

of fact, and requires a determination that every claim limitation or its equivalent be

found in the accused device." *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d

1338, 1343 (Fed. Cir. 2006).   The comparison is only to the patent claims, not to any

specific embodiment in the patent specification or to the patent holder's commercial

embodiment.   *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347

(Fed. Cir. 2003).   The patent holder bears the burden of proving infringement by a

preponderance of the evidence.   *See Warner-Lambert Co. v. Teva Pharm. USA, Inc.*,

418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005); *SmithKline Beecham Corp. v. Apotex

Corp.*, 403 F.3d 1331, 1355 (Fed. Cir. 2005).

A dependent claim in a patent depends upon and incorporates by reference all the limitations of the independent claim to which it refers.  35 U.S.C. § 112, ¶ 4.  The dependent claim refers to an independent claim and then adds a further limitation.  *Id.*

A claim using the words "comprising" or "comprises" in the preamble is not limited to products or methods having only the elements or steps recited in the claim, but also covers products or methods with the elements or steps of the claim and additional elements or steps.  *See Aguayo v. Universal Instruments Corp.*, 356 F. Supp. 2d 699, 707 (S.D. Tex. 2005).

**B.    The '060 Patent and Plunger Lift Technology**

Liquids can accumulate in gas wells and cause a reduction in the amount of gas that flows through the well to the surface.  If the accumulated liquids are not removed, the well can reach a point where gas no longer flows because the pressure in the gas reservoir is not able to flow against the pressure of the liquid in the bottom of the well. This is referred to in the industry as a well that has "loaded up."

Plunger lift systems have been used for many years to remove formation liquids from the bottom of gas wells.  Previously, conventional plunger lift systems used a one-piece piston that was dropped into the well by stopping the upward flow of gas in the well, generally by closing a valve on the flow line.  The one-piece piston would fall through the formation liquids and hit a bumper spring located in the bottom of the well.

The valve on the flow line was then opened and the gas in the well pushed the one-piece piston upwardly toward the surface, pushing the formation liquid on top of the piston to the surface for removal from the well.  Having to "shut in" or close off the well in order for the piston to fall to the bottom of the well was a major disadvantage because the well cannot produce gas while it is shut in.

Other plunger systems, known as "bypass systems," involve an internal valve mechanism for opening and closing the flow passage through the piston.  One type is the "caged ball" system which, although it is a bypass system, involves a one-piece piston because the ball falls into an attached "cage" rather than falling independently to the bottom of the well.  A major disadvantage of these "caged ball" systems is that they often become lodged prior to reaching the bottom of the well and, therefore, do not reach and fully remove the formation liquids from the bottom of the well.

The plunger lift system covered by the '060 Patent is a two-piece system.  There is a sleeve with a flow path through it and a separate lower component, such as the ball, that is designed to seat within the sleeve when the sleeve and the ball are together at the bottom of the well.  This MGM plunger lift system allows the plunger to be dropped in the well without having to shut in the well for more than a few seconds.  The ball drops to the bottom of the well, falling through the formation contents.  The

sleeve separately drops to the bottom of the well, through the formation contents, and joins with the ball.

When the ball and sleeve are united, the flow passage through the sleeve is closed and the pressure at the bottom of the well pushes the plunger upwardly. The formation liquids above the plunger are pushed to the surface to be removed from the well.[6] When the plunger reaches the surface, the sleeve moves up around a separator rod that extends down through the sleeve to dislodge the ball. The ball falls to the bottom of the well, and the sleeve is held on the separator rod by a pressure drop across the sleeve. To cause the sleeve to fall, the flow from the well is momentarily restricted. The sleeve falls, unites with the ball, and the cycle is repeated.

Mega Lift originally marketed a two-piece plunger lift system with a teardrop shaped separator rod. After the Court entered the preliminary injunction in July 2005, Mega Lift began marketing a two-piece plunger lift system with a straight rod. The outer diameter ("OD") of the straight separator rod is the same as the OD of the teardrop shaped rod at its widest point. Both Mega Lift systems function in the same

---

[6]     Generally, the liquid is removed through an upper port or outlet in the housing. Some embodiments include a second, lower, outlet. In these embodiments, the bulk of the gas goes out a lower outlet, with fluids and a lesser quantity of gas going out an upper outlet. The number of outlets is not, however, a limitation in any claim of the '060 Patent.

manner, both using the flow of formation contents to hold the sleeve on the separator rod within the lubricator.

A person of ordinary skill in the field of plunger lift technology for use in oil and gas wells in 2002 would include a person who possesses at least an undergraduate degree in mechanical engineering, petroleum engineering, or similar disciplines, and who has at least two years experience in the design, development, and operation of plunger lift equipment of the type disclosed in the '060 Patent.  A person without the relevant undergraduate degree could be considered a person of ordinary skill in the art if the person had at least four years of experience in the design, development, and operation of plunger lift equipment.

MGM asserts that one or both of the Mega Lift two-piece plunger lift systems infringe claims 8, 1-3, 5-6, and 22-24 of the '060 Patent.

## C.   **Independent Claim 8**

Independent Claim 8 of the '060 Patent reads as follows:

A plunger lift for a well producing through a production string communicating with a hydrocarbon formation, comprising a free piston having at least two sections, movable independently downwardly in the well, the sections comprising a lower component and a sleeve providing a seating surface for receiving the lower component so the lower component and sleeve join together in the well for pushing liquid, above the piston, upwardly and a catcher assembly on the well at the surface comprising a housing, a separator rod in the housing for receiving the sleeve thereon and dislodging the lower component, the housing, rod and

> sleeve providing therebetween *flow passages* for formation contents producing a *pressure drop sufficient to hold the sleeve in the housing against gravity*, the housing providing a path of falling movement for the sleeve to fall into the production string, the catcher assembly being free of components extending into the path of falling movement for retaining the sleeve in the housing.

Claim 8, '060 Patent (emphasis added). Mega Lift concedes, and the evidence establishes, that its teardrop shaped rod system and its straight rod system satisfy all elements of claim 8 *except* that, according to Mega Lift, the Mega Lift devices do not have two or more flow passages and do not use a pressure drop to hold the sleeve in the housing.

**_Two or More Flow Passages._** The Court construed this limitation to mean "two or more flow passages for formation contents where the formation contents flow (1) between the separator rod and the sleeve and (2) between the sleeve and the housing." *See* Memorandum on Claim Construction [Doc. # 77], p. 10, as amended by Order [Doc. # 250]. Mega Lift argues that the space between the separator rod and the sleeve and the space between the sleeve and the housing are so small that neither can constitute a flow passage. The preponderance of the evidence at trial established, however, that the Mega Lift devices both have two or more flow passages.

Claim 8 of the '060 Patent does not include any limitation on the size of the flow passages. Mega Lift notes correctly that the diametric clearance of the flow passage

between the rod and the inside of the sleeve in its Chaser system devices is tiny, measuring only 0.030 of an inch.[7]  The same flow passage of the commercial embodiment of the '060 Patent, however, is only 0.035 of an inch.[8]  The flow passages, while large enough to permit gas to flow through, are necessarily very small so the liquid on top of the sleeve does not flow down through the flow passages back into the well.[9]

MGM's technical expert, Dr. James Lea,[10] demonstrated simply, clearly, and persuasively during trial that there is a flow passage between the sleeve and the housing, and a flow passage between the sleeve and the separator rod.  Specifically, in

---

[7]     This dimension consists of approximately 0.015" all the way around the rod, for a total diametric clearance of 0.030".  Mega Lift attempted at trial to introduce a new argument that the components of its systems could be combined in ways different from the combination disclosed during discovery.  This concept and the different combinations/dimensions were not disclosed timely during discovery, in Mega Lift's expert reports, or otherwise.  As a result, based on the Federal Circuit's decision in *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355 (Fed. Cir. 2006), the Court excluded the evidence and rejected the argument.

[8]     At closing argument, Mega Lift argued for the first time that MGM's commercial embodiment does not contain two or more flow passages and that, therefore, MGM's own two-piece plunger lift system is not covered by the '060 Patent.  For the same reasons that the Court finds there are two or more flow passages in the Mega Lift two-piece systems, the Court finds that there are two or more flow passages in MGM's commercial embodiment.

[9]     Though very small, the flow passages do not create a perfect seal and, as a result, small amounts of liquid may at times flow back into the well.

[10]    Dr. Lea has a Bachelor of Science and a Master of Science in mechanical engineering, and has a Ph.D. in fluid flow.  He has worked in the oil and gas industry for over 20 years, and he has extensive experience with plunger lift systems.  The Court found Dr. Lea to be a credible, persuasive witness, and credits his testimony regarding the contested issues on infringement.

one courtroom demonstration, Dr. Lea attached plastic bags to the outlets above and below the sleeve which was on the Mega Lift system. He then caused air to be blown into the housing while the sleeve and the separator rod were in place, once using the teardrop shaped rod and then using the straight rod. Dr. Lea also demonstrated, with the ball seated in the sleeve and thus the sleeve's inner passage closed, that significant amounts of air could pass by the sleeve while in the housing of the Mega Lift devices. In each demonstration, the plastic bags inflated indicating that air was flowing through the passages through and around the sleeve while in the housing. In addition to seeing that the plastic bags were both quickly inflated by the air flowing through the passages, the Court felt a meaningful flow of air on her hand at each of the two outlets. In a another courtroom demonstration, Dr. Lea poured water through the sleeve with the separator rod in place. Based on these courtroom demonstrations and the other evidence in the record, the Court is persuaded that there are two passages in the Mega Lift systems.[11] This was true for both sizes of the Mega Lift plunger lift systems with

---

[11]     Dr. Lea testified persuasively that there were two meaningful flow passages. In addition to his physical demonstrations, he explained calculations he performed to estimate the total diametric area of the passageways. Dr. Lea relied for these calculations on both Mega Lift's scale drawings which noted the pertinent dimensions. Where dimensions were not available, Dr. Lea relied on his own measurements of the representative Mega Lift plunger and pads (when in position on the plunger). Dr. Lea made his measurements again for the Court during trial. Dr. Lea's measurements and calculations are credible and reliable evidence. Dr. Lea calculated the flow areas through and around the Mega Lift plungers while on the rods are approximately 15%-18%. *See* PX 101. These estimates correspond to the impression the
(continued...)

the teardrop shaped separator rod and the system with the straight rod, although there was less flow through the flow passages when using the straight rod.

Mega Lift argues that Dr. Lea's demonstration did not reflect real oil and gas well conditions. Mega Lift argues that the demonstration did not account for the fluid above the plunger blocking the flow of gas. While it is true that there was no fluid in the plunger lift system during Dr. Lea's demonstration, Dr. Lea explained that the pressure used in the demonstration was significantly lower than would be present in an operational gas well. Consequently, the Court finds that the absence of fluid above the plunger is countered by the reduced gas pressure and, as a result, the demonstration was sufficiently reliable to be persuasive to establish the existence in the Mega Lift two-piece plunger lift devices of two flow passages.

Mega Lift also argues that material accumulates in or on the sleeve over time and causes the passages to become even smaller. While this may be true after the system has been in the well for an extended period of time, it is not true for newly-installed systems. Moreover, there is no evidence that the passages in the Mega Lift systems ever become so small that no gas can flow through them. The Court finds that MGM's

---

[11]     (...continued)
Court had from the courtroom air and water flow demonstrations. Finally, even if these estimates were too large, it is clear that sufficient gas flows past the Mega Lift plunger while on the rod to create two passageways in all versions of the Mega Lift two-piece plunger lift systems.

evidence, while not a perfect reflection of actual well conditions, was probative and reliable.

Based on the evidence presented at trial, the Court finds by a preponderance of the evidence that the Mega Lift plunger lift systems, both the system with the teardrop shaped rod and the system with the straight rod, have two or more flow passages and satisfy this limitation of Claim 8 of the '060 Patent.

**_Sleeve Held on the Separator Rod by a Pressure Drop._**   Mega Lift argues that the sleeve in its plunger lift systems is not held on the separator rod by a pressure drop, but by the "mass" or "momentum" of the flowing gas hitting the bottom of the sleeve while it is on the separator rod.   MGM, relying on the laws of physics and fluid mechanics as explained by Dr. Lea,[12] established that in both Mega Lift systems the sleeve is held on the rod by a pressure drop and not by the "mass" or "momentum" of the gas.   It is clear from the evidence that a flow of gas across a restriction creates a pressure drop.   Also, in a stream of fluid or gas, the pressure upstream of a sizeable

---

[12]   Mega Lift urged in closing argument that the Court should not accept circumstantial evidence but should, instead, require MGM to present the results of actual tests conducted on the Mega Lift systems to measure the amount of pressure drop.   The Court rejects this argument. "A patentee may prove direct infringement . . . by either direct or circumstantial evidence." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006).   Indeed, it is not unreasonable for the fact-finder to credit circumstantial evidence over direct evidence. *See id.* (citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.")).

body in the flow is higher than the pressure downstream of the body, thereby creating a "pressure drop" that pushes the body in the direction of the flow.   Stated differently, there will always be a pressure drop when the flow of gas goes across an area restricting the gas flow.  Mega Lift does not dispute that there is a pressure drop under such circumstances – or in its Chaser systems when the sleeve is on the rod – but contests that the drop is sufficient to hold the sleeve on the rod.

Dr. Lea calculated the amount of pressure per square inch that would be needed to hold the sleeve on the rod against gravity.  His testimony, which the Court credits, establishes by a preponderance of the evidence that, as to each of the varying sizes of sleeves and varying shapes of separator rods used in Mega Lift systems, the pressure drop is adequate to hold the sleeve on the rod.

Dr. Lea also explained how the laws of physics prevent the sleeve from being held on the rod for the reasons or in the manner described by Bartley.[13]  It is against the laws of physics for gas to move from an area of lower pressure towards a higher pressure area.  Consequently, although some of the gas molecules hit the bottom of the sleeve, the Court is unpersuaded by Bartley's theory that the upward flowing gas hits the bottom of the sleeve with sufficient strength to hold the sleeve on the rod.  The

---

[13]    Mega Lift offered no evidence that the sleeve was held on the rod other than by a pressure drop.  Instead, Mega Lift offered only Bartley's *theory* regarding how the sleeve is held on the rod.

Court also rejects Bartley's assertion, which has no scientific support in the record (or logic), that the gas hits the bottom of the sleeve, then *turns around* and flows downward – in the opposite direction from upward moving gas flowing at a higher pressure – to exit the lower outlet.

The Court finds from a preponderance of the evidence that, in both versions of Mega Lift's two-piece plunger lift systems, the sleeve is held on the rod by a pressure drop sufficient to hold the sleeve against gravity.  The Court finds that the Mega Lift system with the teardrop shaped rod and the Mega Lift system with the straight rod both infringe independent Claim 8 of the '060 Patent.

### D.   Independent Claim 1

Independent Claim 1 of the '060 Patent reads as follows:

A plunger lift for a well producing through a production string communicating with a hydrocarbon formation, comprising a free piston having at least two sections, movable independently downwardly in the well, the sections comprising a lower component and a sleeve providing a seating surface for receiving the lower component so the lower component and sleeve join together in the well for pushing liquid, above the piston, upwardly and a catcher assembly on the well at the surface comprising a housing, a separator rod in the housing for receiving the sleeve thereon and dislodging the lower component, the housing, rod and sleeve providing therebetween flow passages for formation contents, *at least one of the flow passages being of variable cross-sectional size* producing a pressure drop sufficient to hold the sleeve in the housing against gravity.

Claim 1, '060 Patent (emphasis added).  As with independent Claim 8, Mega Lift argues that its systems do not satisfy the two limitations of Independent Claim 1 that are common to Claim 8.  For the reasons discussed above, the Court finds that the Mega Lift systems have two or more flow passages and that the sleeve is held on the separator rod by a pressure drop.  Mega Lift also argues that its straight rod system[14] does not have a flow passage that is of "variable cross-sectional size."

MGM argues that the Mega Lift straight rod plunger lift system has a flow passage of "variable cross-sectional size" because there is a lower outlet (sometimes called a flow port) covered by a plate with three holes in a vertical arrangement.  As the sleeve falls down the rod, the sleeve passes by the holes, sequentially blocking one, then two, and finally three holes in succession.[15]  As the holes are blocked, the restriction of the gas flow increases and the pressure beneath the sleeve increases. With the movement of the sleeve across the holes over the port, the pressure drop across the sleeve remains sufficient to hold the sleeve on the separator rod against

---

[14]     Mega Lift does not dispute that, if there is a flow passage between the sleeve and the teardrop shaped separator rod, that flow passage is "of variable cross-sectional size."  Consequently, for the reasons discussed in connection with Independent Claim 8, the Court finds that the Mega Lift two-piece plunger lift system with the teardrop shaped rod infringes Independent Claim 1 of the '060 Patent.

[15]     The sleeve passing by the holes does not create a perfect seal, but largely blocks gas flow because the space between the sleeve and the covered portion of the outlet is a small dimension very close in size to the passageway between the housing and the sleeve above the outlet.

gravity.  The horizontal flow passage from the housing through the lower flow port is of varying cross-sectional size as the holes in the port are blocked by the sleeve.[16]

In addition to the above-noted variable cross-sectional sized flow passage created by the holes in the outlet, Mega Lift's Chaser systems infringe Independent Claim 1 in other ways.  For example, Mega Lift uses in its systems sleeves with parallel indentations around their circumference, sleeves with different sized external pads, and sleeves with external pads that do not cover the entire length of the sleeve.  Each of these sleeve designs creates flow passages of variable cross-sectional sizes between the housing and the exterior of the sleeve as the gas moves over the length of the sleeve while in the housing.

The Court finds that both styles of Mega Lift two-piece plunger lift systems infringe Independent Claim 1 of the '060 Patent.

E.    **Dependent Claims 2-3, 5-6**

Claims 2, 3, 5 and 6 are dependent claims referring to Claim 1.  As discussed above, both Mega Lift two-piece plunger lift systems satisfy every element of Claim 1. To infringe these dependent claims, the systems must satisfy the additional limitation in each dependent claim respectively.

---

[16]    The Court notes that the patent claims, including Claim 1, do not limit the number or direction of the flow passages.  As a result, the existence of a horizontal flow passage is consistent with the patent terms.

Claim 2 reads, "The plunger lift of claim 1 wherein the flow passages comprise a flow passage of variable cross-sectional size between the rod and the sleeve." Claim 3 describes the plunger lift of claim 2 "wherein the sleeve provides a cylindrical passage therethrough and the rod provides a bulging section, the bulging section and the cylindrical passage providing the flow passage of variable cross-sectional size." The Mega Lift system with the teardrop shaped rod satisfies the limitations of Claims 2 and 3. The variable cross-sectional sized flow passage is between the rod and the sleeve as required by Claim 2, and the separator rod has a bulging section as required for Claim 3. The Mega Lift system with the teardrop shaped rod, but not the system with the straight rod, infringes Claims 2 and 3 of the '060 Patent.

Claim 5 reads, "The plunger lift of claim 1 wherein the flow passages comprise a flow passage of variable cross-sectional size between the sleeve and the housing." The Mega Lift device using a straight rod, which the Court has already found satisfies every limitation of Claim 1, has a flow passage between the sleeve and the housing. Because the exterior of the Mega Lift devices' sleeves have either a series of horizontal indentations or have pads creating varying external dimensions on the sleeve, the flow passage between the sleeve and the housing is of variable cross-sectional size. The straight rod system infringes Claim 5 of the '060 Patent.

Claim 6 reads, "The plunger lift of claim 1 wherein the variable cross-sectional flow passage comprises an outlet in the housing of upwardly increasing size."[17]  The Court has already found that the Mega Lift device using the straight separator rod satisfies every limitation of Claim 1. The housing in Mega Lift's devices has two outlets.[18]  The lower outlet is covered by a plate with three holes in vertical alignment. As the sleeve moves upwardly onto and over the separator rod, the sleeve sequentially covers the three holes.  As the sleeve continues to move upward, the bottom of the sleeve passes the outlet holes one by one and the size of the outlet through which the gas can flow increases as additional holes are uncovered.  This causes the outlet in the housing to have upwardly increasing size as required for infringement of Claim 6 of the '060 Patent.  Thus, the Mega Lift devices infringe Claim 6 of the '060 Patent.

**F.    Claims 22-24**

Independent Claim 22 as well as dependent claims 23 and 24 are method claims. "A method claim is directly infringed only by one practicing the patented method."  *RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1267 (Fed. Cir. 2003).  Claim 22 of the '060 Patent reads as follows:

---

[17]    In a second embodiment of the two-piece plunger lift system covered by the '060 Patent, this outlet is described and depicted in Fig. 6 in the shape of an inverted pyramid.

[18]    The MGM systems do also.  The '060 Patent's claims do not limit number of outlets.

A method of lifting liquids from a well producing hydrocarbons from a formation through a well head with a plunger lift having a multipart piston including an upper sleeve and a lower component and a decoupler on the well head for separating the piston into its parts comprising a rod for receiving the sleeve and dislodging the lower component, comprising holding the sleeve in the decoupler by passing formation contents upwardly; and then releasing the sleeve and allowing it to fall into the well by restricting flow of formation contents.

Claim 22, '060 Patent.  Mega Lift has stipulated that its plunger lift systems satisfy the first part of Claim 22, up to the word "comprising."  *See* "Agreed Stipulated or Admitted Facts" [Doc. # 188-2], ¶¶ 13-14, 17, 19-20, 28.  Mega Lift has also stipulated that the "sleeve or padded plunger of the accused products is held on the separator rod at the surface by the upward flow of formation contents during operation of the accused products."  *See id.,* ¶ 21.  Mega Lift contests that this stipulation satisfies the claim limitation "holding the sleeve in the decoupler by passing formation contents upwardly."  The difference between "passing formation contents upwardly" found in the claim language and Mega Lift's stipulation of "upward flow of formation contents" is factually and legally insignificant.  If formation contents are passed upwardly, there is an upward flow of formation contents.  Pursuant to this stipulation, the Mega Lift plunger systems satisfy this claim term.

In connection with the claim limitation "then releasing the sleeve and allowing it to fall into the well by restricting flow of formation contents," Mega Lift stipulated

that the "sleeve or padded plunger of the accused products is released from being held on the separator rod by shutting-in the well for a brief period of time, thereby releasing the sleeve or padded plunger and allowing it to fall from the housing into the well." *See id.*, ¶ 22.  Although unclear, Mega Lift appears to argue that "shutting-in the well" does not restrict the flow of formation contents.  The evidence presented at trial establishes, however, that the process of shutting-in a well necessarily involves incrementally restricting the flow of formation contents until the flow is completely restricted and it ceases.  Mega Lift's stipulation that the sleeve is released by shutting-in the well for a brief period of time satisfies the final limitation of Claim 22.

Claim 23 describes the "method of claim 22 wherein the holding step comprises creating a pressure drop across the sleeve by flowing formation contents upwardly." As was discussed in connection with independent Claim 8, the Mega Lift sleeve is held on the separator rod by a pressure drop created by the upward flow of formation contents.  Consequently, operation of the Mega Lift two-piece plunger lift systems infringes method Claim 23 of the '060 Patent.

Claim 24 describes the "method of claim 23 wherein the releasing step comprises closing a valve leading from the well."  The evidence at trial establishes that, when it is time to release the sleeve in both Mega Lift systems, the well is "shut-in" by

closing a valve leading from the well.  This satisfies the additional limitation of Claim 24.

For some customers, Mega Lift installs the two-piece plunger lift system in the customer's well and operates it through several cycles to check that it is operating properly.  Mega Lift's operation of its infringing systems during this testing process constitutes direct infringement of method Claims 22, 23 and 24.

After Mega Lift completes the testing process, the customer operates the plunger lift system on its own.  Additionally, for some customers, Mega Lift sells the system to the customer who installs it in the well without assistance from Mega Lift.  In these circumstances, the customer's operation of Mega Lift's plunger lift system is direct infringement of the '060 Patent.   Mega Lift has stipulated that there "is no substantial non-infringing use for the accused products."  *See id.*, ¶ 35.  It is undisputed that Mega Lift has known, at least since being served with the summons and complaint in this case in May 2005, of the existence of the '060 Patent and of MGM's contention that Mega Lift's two-piece plunger lift system infringes the patent.  Consequently, Mega Lift is liable for contributory infringement of Claims 22, 23 and 24 when its customers operate the infringing systems.

## III.  DAMAGES

### A.  Applicable Legal Principles

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.  The prevailing patent holder's damages can include "lost profits due to diverted sales, price erosion, and increased expenditures caused by infringement." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996).  "Because fashioning an adequate damages award depends on the unique economic circumstances of each case, the trial court has discretion to make important subsidiary determinations in the damages trial, such as choosing a methodology to calculate damages." *Id.*

To recover lost profits, the patentee "must show that the infringer actually caused the economic harm for which the patentee seeks compensation."[19] *Id.*  The lost profits analysis is guided by the four-factor test articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  *See Golden Blount, Inc. v. Robert*

---

[19]     Once the patent holder establishes causation, "the trial court may resolve doubts underlying the precise measurement of damages against the infringer." *Minco*, 95 F.3d at 1118.  The burden remains, however, for the patentee to prove its damages by a preponderance of the evidence. *See id.*

*H. Peterson Co.*, 438 F.3d 1354, 1371 (Fed. Cir. 2006).  "The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit it would have made."  *Id.* at 1372-72 (citation omitted).

"A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages."  *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991).  "Accordingly, if purchasers are motivated to purchase because of particular features available only from the patented product, products without such features – even if otherwise competing in the marketplace – would not be acceptable noninfringing substitutes."  *Id.*

A patentee may only recover damages for infringing sales that occurred after it gave actual or constructive notice of its patent rights.  *See Sentry Protection Prod., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005).  Actual notice is given when the patent holder notifies the accused infringer of its alleged infringement and identifies the product that is infringing.  *See SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).  MGM clearly gave Mega Lift actual notice on May 13, 2005, when it served the summons and complaint in this case.

"Constructive notice is provided when the patentee consistently marks substantially all of its patented products." *Sentry*, 400 F.3d at 918 (internal quotations and citations omitted).  A patentee may give constructive notice that a product is patented by marking the product or affixing to it the word "patent" or the abbreviation "pat." with the patent number.  *See* 35 U.S.C. § 287(a).  This marking must be "substantially consistent and continuous" for it to qualify as constructive notice.  *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).  The "focus is not on what the infringer actually knew, but on whether the patentee's actions were sufficient, in the circumstances, to provide notice *in rem*."  *See id.*  The patentee must prove constructive notice by a preponderance of the evidence.  *See id.* at 1447.

When the patented device involves multiple components, it is not necessary that each component be marked.  *See Douglas Press v. Arrow Int'l, Inc.*, 1997 WL 441329, *6 (N.D. Ill. July 30, 1997) (citing *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed. Cir. 1994) (stating that patent holder could satisfy marking requirement by marking either the component or the completed product).  In *Douglas Press*, the plaintiff had patents disclosing a "multi-component product consisting of a master game card and individual playing cards."  *Id.* at *5.  The product was marketed with the playing cards and the master game card together in "transparent shrink-wrap packaging."  *Id.*  The plaintiff "consistently and continuously marked the master game

cards" with the correct patent numbers, but did not mark the playing cards or the packaging. *Id.* The district court held that the practice satisfied the marking requirement. *Id.* at *7.

### B.   Lost Profits Analysis

The Court finds that the analysis conducted and presented in trial by Thomas William Britven, MGM's damages expert, was well-reasoned and persuasive. MGM has proven by a preponderance of the evidence each element on the *Panduit* test and therefore is entitled to recover lost profits.

***Demand.*** The Court finds there is great demand for MGM's patented plunger lift system. Indeed, MGM's sales increased more than 2000% after it introduced the patented system, while its sales of other plunger systems declined to only 5%-10% of total sales. Mega Lift also sold a large number of infringing plunger lift systems, supporting the existence of high demand for the system. Mega Lift argues that the increase can be attributed to a rise in gas prices. The Court finds the argument unpersuasive. If the dramatic increase in sales were caused by increased gas prices, one would expect a similar increase – instead of the actual decrease – in sales of other plunger lift systems. The record establishes, and the Court finds, that the demand for the plunger lift system covered by MGM's '060 Patent was the primary cause of MGM's increased sales after it was introduced.

***Benefits of Patented System.***   The patented two-piece plunger lift system has many benefits over prior technology that cause there to be high demand and that relate to whether there are acceptable, non-infringing alternatives.   The MGM system eliminates the release of natural gas to the atmosphere, providing both an environmental benefit and an economic benefit.

The MGM system is more efficient than predecessor plunger lift systems.   The well must be shut in for only a few seconds to begin a new cycle.   As a result, productivity increases because the operation of the well is not interrupted for as long as is required by the conventional and caged-ball systems.

The MGM system has a lower system failure rate than pre-existing and currently available one-piece plunger systems.   Automated mechanical catcher assembly systems have more moving parts to become damaged and cause the failure of the catcher assembly.   Even the caged ball system would often not fall all the way to the bottom of the well, resulting in more liquid formation contents remaining in the well.

A customer's overall costs are reduced with the MGM system covered by the '060 Patent.   The patented system does not require an automated mechanical catcher assembly and piping, retains natural gas in the well that would previously be lost when vented to the atmosphere, has reduced maintenance and repair costs, and allows an increase in production time and efficiency.   MGM thus has shown that two-piece

plunger lift systems covered by the '060 Patent have substantial benefits over other designs in the marketplace.

**_No Acceptable Non-Infringing Alternatives._**  The Court finds that there are no acceptable non-infringing alternatives to the device covered by the '060 Patent, either from Mega Lift or elsewhere in the market.[20]  Customers want the benefits described above.  Indeed, some customers have internal policies requiring them to use plunger lift systems that do not release pollution to the atmosphere.   Although customers may occasionally use a conventional one-piece system or a caged ball system because circumstances unique to a specific well preclude the use of the MGM system for that well, the Court finds that customers do not consider these prior systems an acceptable alternative generally.  This is clear from the decrease in MGM's sales of other systems after the introduction of the two-piece plunger lift system covered by the '060 Patent.

**_Manufacturing and Marketing Capability._**  The Court finds that MGM had and continues to have the manufacturing and marketing capability to handle the increased

---

[20]     Mega Lift sought to introduce evidence that Dan Casey manufactures and sells a two-piece plunger lift system that uses a separator rod, potentially an acceptable non-infringing alternative if it is actually marketed.  Mega Lift did not, however, disclose this Casey system until it filed its Final Invalidity Contentions, well after the deadlines set forth in the Court's Discovery and Docket Control Orders.  As a result, citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355 (Fed. Cir. 2006), the Court excluded evidence of this and any other alleged Casey system that was not timely disclosed.  *See* Memorandum and Order [Doc. # 175].

sales it would have enjoyed had Mega Lift not been selling infringing systems.[21]
During most of the times relevant to this case, MGM has outsourced the manufacturing
of the components for its patented system and, as a result, its manufacturing capacity
has been virtually unlimited.  MGM had nineteen full-time sales representatives and,
for a time, three independent distributors.  MGM competed in many of the same
markets as Mega Lift.  Thus, MGM was capable of handling the increased marketing
requirements that may have been necessary to make the sales Mega Lift obtained.
Moreover, since IPS purchased MGM in June 2006, MGM has the benefit of IPS's
significantly larger sales force.  MGM was and is capable of handling the increased
manufacturing and marketing to sell to customers that purchased Mega Lift's infringing
systems.

  ***Quantifying Lost Profits.*** The Court finds Britven's methodology for
calculating lost profits to be accurate and appropriate.  Indeed, except for Britven's use
of a longer infringement period, Mega Lift's expert did not criticize Britven's
methodology.[22]  Because MGM and Mega Lift are the only companies marketing the
device covered by the '060 Patent, and because the Court finds that there were no

---

[21] MGM and its expert opine that the increase in monthly sales above then-current MGM levels
would be a modest 10%.

[22] Mega Lift's expert proposed, without adequate explanation, a damages period that began
when this lawsuit was filed and ended when the Court issued its preliminary injunction.

acceptable non-infringing alternatives, the Court finds that Mega Lift's sales during the damages period would have been made by MGM absent Mega Lift's infringement.

The Court finds that MGM gave Mega Lift actual notice when it served the summons and complaint on May 13, 2005.  The Court further finds that MGM began consistently marking the separator rod of its patented plunger lift system by no later than February 15, 2005, which is prior to Mega Lift's first infringing sale.  Based on the persuasive analysis in the *Douglas Press* case, the Court finds that MGM satisfied the marking requirement of § 287(a).  As a result, the damages period is from February 16, 2005, to the time of trial.

Mega Lift failed to produce its sales records beyond July 2006.  Britven analyzed the sales records that were produced and counted the number of infringing systems Mega Lift sold.  Where Mega Lift invoices indicated that a customer purchased all the components of an infringing system, Britven counted the sale as a system even if the components were listed individually on the invoice.   Britven then calculated, extrapolating from the number of infringing systems sold through July 2006, the number of infringing systems that, more likely than not, Mega Lift would have sold through the time of trial.  Britven counted and calculated that Mega Lift would have sold 228 infringing systems during the damages period.  The resulting lost revenue, based on MGM's average sales price for its patented systems, is $1,439,056.00.

Additionally, MGM lost profits from the sale of replacement parts.  Replacement parts are required approximately every year for the bumper spring assembly, and approximately every nine months for the plunger sleeve and ball, and for the separator rod.  Applying MGM's average sales price for these components, MGM's lost revenue for replacement parts is $412,302.00.[23]

The Court finds that Britven properly calculated MGM's incremental profit margin.  In his calculation, Britven included *inter alia* manufacturing costs and expenses, commissions for distributors, shipping costs, expenses for completing repairs and maintenance, utility costs, bad debts, and working capital.  The cost of goods was calculated to be 41%, commissions and bonuses were 3.8%, and other combined costs were 7.2%.  Britven added in a 2% contingency to cover other potential costs not already included in the calculation.  Britven calculated MGM's incremental costs to be 54%, leaving an incremental profit margin of 46%.  The Court finds the analysis to be well-reasoned and the calculation to be correct and appropriate.  As a result, the Court finds that MGM's incremental profit margin is 46%.

---

[23]     MGM argued, and the Court finds, that there are additional lost profits resulting from MGM's inability to raise prices because Mega Lift was selling an infringing product in key markets. MGM did not, however, include this in its damages calculation.  The Court finds that this element of MGM's damages is difficult to quantify and is properly excluded from the lost profits analysis.

Applying the 46% profit margin to the lost revenues, MGM's lost profits from Mega Lift's infringement are $851,625.00.  MGM is entitled to judgment against Mega Lift for this amount.

## IV.   <u>PERMANENT INJUNCTION</u>

The Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  To obtain a permanent injunction in a patent case, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, __ U.S. __, 126 S. Ct. 1837, 1839 (2006).  Whether to grant a permanent injunction is within the equitable discretion of the district court.  *Id.*

The Court finds that MGM has established that it has suffered and will continue to suffer irreparable harm if an injunction is not issued.  The '060 Patent gives MGM the right to exclude others from practicing its patent, and MGM has proven an existing

policy not to license its patented technology.[24]  MGM has not, however, been able to enjoy this benefit because of persistent infringement by Mega Lift, its direct competitor. Moreover, there is no reason to believe that Mega Lift and its principal will refrain from marketing infringing products absent a permanent injunction.  The Court issued a preliminary injunction in July 2005, but Mega Lift has continued to market infringing products.[25]  Only several years ago, following a prior judgment of patent infringement in another lawsuit, Mega Lift – then Mega Systems – filed bankruptcy and changed its corporate name while retaining the same employees, officers, office, and practice of infringement.[26]

Monetary damages are not adequate to compensate MGM for the continued loss of the exclusive rights under the '060 Patent.  Future damages cannot be readily calculated at this point.  Because MGM is not willing to license Mega Lift to practice the '060 Patent, MGM would likely be required to engage in protracted and repeated litigation against Mega Lift if there is no permanent injunction against Mega Lift and

---

[24]     A patent holder's willingness to license its technology, though not dispositive, is a factor to be considered in connection with the "irreparable harm" inquiry.  *See IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 225 (D. Del. 2007).

[25]     The preliminary injunction was not limited to infringing systems using a teardrop shaped separator rod, but instead enjoined the sale of *any* "two-piece plunger lift system . . . that infringes any claim of MGM's '060 Patent." *See* Memorandum and Order [Doc. # 29], p. 14. Nonetheless, Bartley, without seeking advice of counsel beforehand, chose to market an infringing two-piece plunger lift system with a straight separator rod.

[26]     Both entities were/are largely owned and operated by Bartley.

Bartley, its principal.  Because the threat of continued infringement exists, an injunction is appropriate.

Considering the balance of hardships between MGM and Mega Lift, a remedy in equity is warranted.  MGM's irreparable injury weighs heavily in favor of granting a permanent injunction, while the hardship to Mega Lift is that it will not be able to sell two-piece plunger lift systems that infringe the claims in the '060 Patent.  This hardship is imposed by law, not by any peculiar circumstances of this case.  It was established at trial, and the Court finds, that Mega Lift markets non-infringing one-piece systems.  Indeed, Mega Lift represented at trial that sales of one-piece systems constitute approximately half its total sales of plunger lift systems.  Mega Lift is free to focus on the sale of these non-infringing systems and an injunction against selling infringing systems should not impose an unreasonable hardship.

The Court finds that the public interest will not be disserved by a permanent injunction in this case.  The public interest is best served by protecting patent rights and enforcing the applicable laws.  *See Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006).  Mega Lift argues that the public has an interest in competition, but Mega Lift will remain free under the permanent injunction to market its one-piece plunger lift systems in competition with MGM's patented system.

The Court has carefully considered the four-factor *eBay* test and finds that each factor, under the totality of the circumstances presented in this case, weighs in favor of a permanent injunction.

## V.   EXCEPTIONAL CASE – ATTORNEYS' FEES

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "Exceptional cases usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement, . . . misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *Serio-US Indus., Inc. v. Plastic Recovery Tech. Corp.*, 459 F.3d 1311, 1321-22 (Fed. Cir. 2006). An award of fees pursuant to § 285 is "limited to circumstances in which it is necessary to prevent a gross injustice." *FieldTurf Int'l, Inc. v. Sprinturf, Inc.*, 433 F.3d 1366, 1373 (Fed. Cir. 2006) (quoting *Forest Labs, Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003)). The prevailing party must prove an exceptional case by clear and convincing evidence. *See Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1380 (Fed. Cir. 2005).

In this case, MGM is the prevailing party. On the first day of trial, MGM withdrew its willful infringement claim and, as a result, the parties did not present evidence on that issue. The Court found on more than one occasion that Mega Lift had

engaged in misconduct during this litigation, but the Court dealt with those infractions fully and adequately by other means, both remedial and punitive.  As a result, and although the question is a close one, the Court finds that MGM has not shown by clear and convincing evidence that this is an exceptional case in which a gross injustice can be avoided only by the award of attorneys' fees.

## VI.   **CONCLUSION**

Mega Lift's teardrop shaped rod and straight rod "Chaser" systems infringe Claims 1-3, 5, 6, and 8 of the '060 Patent.  Use of those systems by Mega Lift and its customers infringes the method Claims 22, 23 and 24.

MGM has demonstrated its entitlement to and the amount of its lost profits. MGM also has established that it is entitled to a permanent injunction against future infringement by Mega Lift.  MGM has not shown by clear and convincing evidence that this is an exceptional case and, as a result, the Court will not award attorneys' fees.

The Court will issue a separate Final Judgment.

SIGNED at Houston, Texas, this **25th** day of **April, 2007.**

Nancy F. Atlas
United States District Judge